Whitakek, Judge,
dissenting:
Had any employee of the United States Government been ordered overseas to render some service to United States troops abroad and had been aboard the ill-fated airplane that crashed with plaintiffs, he would have received what plaintiffs have already received and no more. I perceive no reason why plaintiffs, in equity and good conscience, are entitled to anything more.
They were performing a patriotic duty, possibly at a personal sacrifice, but so were millions of other Americans. They were casualties of war, but there were innumerable casualties of war. They should be treated on the same plane as everybody else. “Equal justice to all and special privileges to none.”
Davis, Judge, took no part in the consideration and decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Roald A. Hogenson, and the briefs and argument of counsel,, makes findings of fact as follows:
1. Private Law 85-713, 85th Congress, approved August 27, 1958, provided that the Secretary of the Treasury pay to Jane Froman the sum of $23,403.58, to Gypsy Markoff $23,403.58, and to Jean Rosen (formerly the widow of Roy Rognan) $24,625.30. Such sums were the amounts these *674 plaintiffs would have received under the compensatory provisions of the Federal Employees’ Compensation Act (without application of the 1949 amendment) if they had been employees of the defendant at the time of the accident hereinafter related.
This private law further provided that payment of the specified sums would be “in full satisfaction of all claims of the said Jane Froman, Gypsy Markoff, and Jean Eosen arising out of an accident which occurred on or about February 22, 1943, when the Pan American Airways seaplane ‘Yankee Clipper’, on which they were traveling to entertain members of the Armed Forces of the United States, crashed in the Tagus Eiver in the Port of Lisbon, Portugal * * * without prejudice to their right to receive such additional amounts, if any, as the Court of Claims hereafter may report to the Congress, in accordance with the provisions of section 2 of this Act, as being legally or equitably due such persons.”
Section 2 of this private law provided as follows:
The claims referred to in the first section of this Act, together with any papers, documents, or other information pertaining to such claims which are in possession of any committee of Congress, may be referred by the chairman thereof to the Court of Claims; and the court shall proceed with the same in accordance with the applicable provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Committee on the Judiciary of the Senate and to the Committee on the Judiciary of the House of Eepresentatives, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amounts over and above the amounts paid pursuant to the first section of this Act, if any, legally or equitably due from the United States to any such claimants. In considering any claim pursuant to this section, the Court of Claims shall give consideration to any questions of law or fact which may be stated in letters transmitted to the court by the chairman of the Committee on the Judiciary of the Senate and the chairman of the Committee on the Judiciary of the House of Eepresentatives within ninety days after the date of the enactment of this Act.
*675 2. By letter dated November 12, 1958, to Chief Judge Marvin Jones of this court, Senator James O. Eastland, Chairman, Committee on the Judiciary, United States Senate, stated as follows:
In accordance with the provisions of Private JCaw 713 of the 85th Congress, for the relief of Jane Froman, Gypsy Markoff and Jeanne Eognan, a copy of which Private Law is enclosed, I am referring to you the claims of the three named claimants for a determination, and a report back to the Congress, on the nature and character of their claims, legal or equitable, against the United States, and the amounts, if any, legally or equitably due from the United States to any of these claimants over and above the amounts paid pursuant to the first section of Private Law 713.
The first section of Private Law 713 provided for the payment to these claimants of the amounts which they would have received under the compensatory provisions of the Federal Employees Compensation Act if the claimants had been Federal employees at the time of the accident out of which their claims arose. During the course of Senate hearings on the proposed legislation there was discussion in regard to which statute should be used as a yardstick for the determination of the payments which they would have received under the compensatory _ provisions of the Federal Employees Compensation Act if they had been Federal Employees at the time of the accident. The proposed legislation as originally passed by the House applied the provisions of the 1916 Employees Compensation Act. During the course of the Senate hearings it was suggested that the amendments adopted to that Act by the Congress in 1949 would be the more appropriate provisions to serve as a yardstick inasmuch as the accident out of which these claims arose occurred in 1943. This question as to the possible application of the amended Employees Compensation Act is one question which is presented by the Congress to the Court for determination.
The bill as originally passed by the House of Eepre-sentatives provided for the relief only of Miss Froman and Miss Markoff. The Senate amended the legislation to include the claim of Jean Eosen which claim had been submitted in a private bill introduced by Senator Joseph C. Clark. The legislation for the relief of Mrs. Eosen, as introduced by Senator Clark, included the matter of relief for that claimant by virtue of the death of her late husband, Eoy Eognan. The matter of the possible com *676 pensation of this claimant by virtue of the death of her husband is accordingly included in the matter as referred to the Court of Claims.
In the discussion in the Committee on the Judiciary preceding the approval by the Committee of the amended legislation, it was made clear that the Committee wished to have the benefit of the determination by the Court of Claims in regard to the questions: Whether there is any legal or equitable liability on the part of the United States to reimburse any of these claimants; what amounts of medical expenses were incurred by any of these claimants from injuries growing out of the accident; the question of the adjustment of any such possible payments by the Government in light of deductions made by any of the claimants from any of their income tax returns for medical expenses; and the question of the adjustment of any such possible payments by the Government in light of the receipt by any of the claimants of any contributions by persons or organizations made to assist the claimants in defraying any of their medical expenses.
Transcripts of hearings conducted on this legislation by a Subcommittee of the Committee on the Judiciary and subsequently by the full Committee on the Judiciary, and all papers, documents and other information pertaining to these claims in the possession of the Committee are herewith referred to the Court of Claims.
3. At all times pertinent in this case, Camp Shows, Inc., was a private, voluntary, nonprofit New York corporation, organized for the purpose of providing professional entertainment to the Armed Forces of the United States in World War II. It was a member agency of and received its funds from the United Service Organization, a private agency widely known as the U.S.O., which was supported by voluntary contributions of the American public to provide hospitality and entertainment to its servicemen. Camp Shows received no financial support from the defendant.
Defendant’s War Department (or its Navy Department in the appropriate cases) cooperated with and recognized Camp Shows as the organization procuring professional performers from the entertainment industry to entertain servicemen at home and abroad. The War Department arranged for the transportation of such entertainers on either military or civilian facilities, as available, bearing the *677 costs in either event, and also provided food and lodging to entertainers going overseas. When entertainers were to travel to overseas installations, the Office of the Adjutant General issued invitational orders and arranged for travel priorities and transportation facilities. Camp Shows procured the entertainers and paid their salaries or allowances and other expenses.
Camp Shows made salary or allowance arrangements with such entertainers in two categories: (1) The performer whose services were to be paid for by Camp Shows at a salary negotiated by agreement between the individual and Camp Shows, and (2) the guest artist with stature in the entertainment industry, whose usual rate of compensation could not be paid by Camp Shows, but who could afford to and did donate his or her services, being paid by Camp Shows only a $10 per day allowance to defray incidental out-of-pocket expenses while on tour.
4. On February 18, 1943, plaintiff Jane Froman (legal name Ellen Jane Foss), plaintiff Gypsy Markoff (legal name Olga Witkowska), and Eoy Eognan and his wife Jean Eognan (the latter being plaintiff Jean Eosen whose stage name was Jeanne Lorraine) signed agreements with Camp Shows whereby they undertook to entertain members of the armed services of the United States stationed overseas. These four individuals and three other professional entertainers were organized by Camp Shows as an entertainment group to tour together as a troupe.
5. Miss Froman and Mr. and Mrs. Eognan, at the request of Camp Shows, volunteered and donated their services as part of the entertainment troupe. They were entertainers of stature and renown, and each was to receive under their contracts with Camp Shows only the $10 per day guest artist allowance. The other four members of the troupe, Tamara, Grace Drysdale, Yvette, and Gypsy Markoff, were engaged as paid entertainers under their contracts with Camp Shows. Plaintiff Markoff was to be paid $125 per week.
6. On February 19, 1943, each of the plaintiffs and the other members of the troupe were contacted by Saul Abraham, an employee of Camp Shows, and advised to prepare themselves for departure. Mr. Abraham had each of them *678 execute a War Department security questionnaire, and the Office of the Adjutant General accepted and approved all of the members of the troupe for the contemplated services and issued invitational travel orders. Mr. Abraham accompanied these performers and assisted them in obtaining passports and visas.
7. The War Department issued travel priorities and made the arrangements to have the troupe of entertainers transported overseas at defendant’s expense by a commercial airline company, Pan American Airways.
Neither Camp Shows nor any member of the troupe was advised as to destination or as to places where the troupe would entertain servicemen, but only knew that they were to perform somewhere outside the continental limits of the United States.
The War Department notified Mr. Abraham to pick up the airplane tickets at the New York office of Pan American Airways. After doing so, Mr. Abraham assembled the troupe, accompanied them to the marine terminal at La-Guardia Airport, and processed them through customs and terminal facilities.
Mr. Abraham then gave each of the entertainers a boarding pass for the assigned Pan American aircraft, a seaplane named the Yankee differ, and had Hoy Rognan, as designated manager of the troupe, take possession of the ticket stubs and passports for the members. The troupe then boarded the seaplane still unaware of their destination.
8. None of the members of the troupe was informed of the provisions of the Warsaw Convention, limiting the liability of the carrier to $8,291.87 per passenger for injuries sustained in the course of international flight, unless the carrier was adjudged guilty of willful misconduct in the operation or maintenance of the aircraft. The passage tickets were neither delivered nor exhibited to any member of the troupe but indicated such limitation of liability. None of the troupe members had any opportunity to procure accident or life insurance for the trip, and Camp Shows did not arrange or provide for any such insurance, although it did arrange for such insurance coverage after the accident involved in this case.
*679 9. The seaplane, the Yankee Clipper, left New York City on February 22, 1943, with plaintiffs and their troupe on board, and crashed the following day, February 23, 1943, into the Tagus Eiver while attempting to alight at the Port of Lisbon, Portugal. Twenty-three persons were killed in the accident, including Mr. Eognan, and several others were injured, including the plaintiffs herein.
Each of the plaintiffs received treatment at hospitals in Lisbon and ultimately returned to the United States, where treatment for their injuries was continued.
10. The body of Eoy Eognan was returned to Los Angeles, California, by the War Department at defendant’s expense, and his remains were cremated and placed in a niche at Forest Lawn Memorial Park. Funeral expenses paid by plaintiff Jean Eosen (then Jean Eognan) amounted to $3,366.89. This sum included the expense of a niche costing $1,625, one-half of which was reserved for plaintiff Eosen, and the net funeral expenses were thus $2,554.39.
11. The parties have stipulated that the seaplane crash did not occur because of negligence or misconduct on the part of any employee of the defendant and that plaintiffs were not employees of the defendant at the time they were injured.
The parties have further stipulated that defendant has never had any tort liability to plaintiffs in this case, and that defendant is not presently liable in law on any other account to plaintiffs.
12. In 1943, subsequent to the seaplane crash, each of the plaintiffs received $3,600 as a gift from Camp Shows. In addition, plaintiffs Froman and Markoff each accepted a loan of $8,300 from Camp Shows, and were ultimately relieved of liability to repay on June 7,1949, without any repayments ever being made. Plaintiff Eosen was also offered but did not accept a like loan by Camp Shows.
13. Plaintiff Froman continued to receive the guest artist allowance of $10 per day from Camp Shows for 204 days after the accident, or a total of $2,040; and plaintiff Eosen also continued to receive the same allowance for 49 days, or a total of $490.
*680 Plaintiff Markoff continued to receive her salary from Camp Shows for 41 weeks after the accident at the contract rate of $125 per week, or a total of $5,125.
14. For replacement of personal property lost by her in the seaplane crash, Camp Shows expended $800.25 for a new accordion and $371.91 for personal clothing for plaintiff Markoff.
15. Plaintiffs Froman and Markoff brought suits in the Supreme Court, New York County, against Pan American Airways, and each recovered a judgment for $8,300 as damages limited under the provisions of the Warsaw Convention for all personal injuries and medical expenses incurred by each of them as a result of the seaplane crash. By such judgments, plaintiff Froman also recovered $750, and plaintiff Markoff $1,280 for loss of baggage. These judgments were affirmed by the New York Court of Appeals, and certiorari was denied by the United States Supreme Court.
16. Plaintiff Eosen also brought suit against Pan American Airways on her own behalf and as administratrix of the estate of her husband, Eoy Eognan. This action was settled on January 8,1951, on the basis of maximum liability under the Warsaw Convention, by payment to Mrs. Eosen of $8,300 for her personal injuries and $750 for loss of her personal property, and by payment to Mrs. Eosen, as ad-ministratrix, of $8,300 for the death of Eoy Eognan and $750 for loss of his personal property.
17. Commencing after the crash and over a period of years, plaintiff Markoff received funds from her late fiance in the total amount of $20,000 to help defray her living and other expenses. From 1943 through 1956, Miss Markoff received the further total amount of $16,000, comprised of individual transfers of $5,000, $4,000, $3,000 and four of $1,000 each, from various friends. Miss Markoff considered these payments to be loans, although she has never been able to repay them. The evidence in this case, however, indicates that such payments constituted voluntary assistance to Miss Markoff by personal friends, without expectation of repayment. The extent to which such funds were used to defray Miss Markoff’s medical expenses is not shown.
*681 18. Prior to the seaplane crash, plaintiff Froman had achieved outstanding prominence as a radio and nightclub singer. Her earnings for the years 1938 through 1943 were as follows:
1938_$20,250
1939_ 23,100
1940_ 25,700
1941_ 22,961
1942_ 36, 692
1943_ 17, 000
Of her 1943 earnings, $12,770 was received by Miss Froman for her performance in the show “Artists and Models” which ran from October 11 through November 27, 1943, during which time she was in a cast and had to be carried on and off stage.
19. Despite the serious injuries sustained by plaintiff Fro-man in the seaplane crash and the interruptions required for operations and treatments, she was able to continue her career as a singer on the stage, in nightclubs and on radio and television. Her earnings from professional appearances and from other sources, such as the sale of her life story made into a motion picture and from various investments, were as follows for the years 1944 through 1958:

Gross income

Year From professional From other appearances sources Total

1944. $31, 919. 10 _ $31, 919. 10
1945. 53, 786. 33 _ 53, 786. 33
1946. 82, 466. 67 _ 82, 466. 67
1947. 14,785.70 ... 14,785.70
1948. 94, 142. 84 _ 94, 142. 84
1949. 24, 650. 00 _ 24, 650. 00
1950. 49, 725. 00 $60, 032. 15 109, 757. 15
1951. 58, 000. 00 _ 58, 000. 00
1952. 86, 353. 97 1, 622. 82 87, 976. 79
1953. 202, 814. 25 2, 808. 35 205, 622. 60
1954. 149, 774. 83 2, 580. 40 152, 355. 23
1955. 139, 203. 08 4, 623. 28 143, 826. 36
1956. 130, 503. 98 5, 599. 58 136, 103. 56
1957. 47, 078. 65 4, 080. 71 51, 159. 36
1958. 4, 774. 12 3, 247. 65 8, 021. 77
$1,169,978.52 $84,594.94 $1,254,573.46 Total.
*682 From the sale of her life story, Miss Froman received $120,000 and the further sums of $5,000 and $25,000 for technical and other assistance to the motion picture company.
During 1959, plaintiff received professional earnings in the total sum of $36,000, being for a 3-week engagement at $5,000 per week, or $15,000, at the Chez Paree, a Chicago nightclub, and a 6-week engagement at $3,500 per week, or $21,000, at the Plaza Hotel, New York City.
In 1960, up to June 23, Miss Froman earned about $18,200, comprised of $700 for fulfilling 5 days of a 2-week engagement at the Casino Boyal, Washington, D.C., the unfulfilled part being due to Miss Froman’s inability to continue; $8,000 for a live television performance on the Bell Telephone Hour; $1,000 for a filmed appearance on television in the Arthur Murray Show; $3,500 for a live television appearance on the Ed Sullivan Show; and $5,000 for performance of part of a 3-week engagement at the Fairmont Hotel, San Francisco. In the latter instance, Miss Froman again collapsed after performing for 5 or 6 days, and the rest of the engagement was canceled.
20. Plaintiff Froman sustained severe personal injuries in the seaplane crash, consisting primarily of a compound com-minuted fracture of the tibia and fibula of the right leg, so severe that the union of the fractured tibia was not accomplished until 1948 after repeated operative procedures, including grafting of bone and skin tissues. The residual damage to the bone structure of the right leg, together with the wasting of muscle tissue, all resulting from injuries sustained in the crash, is permanent, and there remains a weakness and deformity of the bone structure and wasting of the muscles of the right leg which require Miss Froman to wear a steel and laced-leather brace, extending from just below the knee to the ankle, having steel side bars which are further extended and attached to either side and the instep portion of the right shoe.
Miss Froman also suffered severe injuries to her right arm resulting in a deep and permanent scar extending from her elbow along and around the lower arm to a point just above the wrist, with residual wasting of muscle tissues and some permanent limitation of function.
*683 As a result of tlie above-described deformities and disfigurement of the right leg and right arm, and the necessity to wear a leg brace, Miss Froman has worn dresses with long skirts sweeping the floor and full-length gloves extending well above her elbows in the performance of her professional work.
21. After extensive initial treatment at the Lisbon hospital following the seaplane crash, plaintiff Froman was returned by ship under the care of a Portuguese physician to New York City and admitted to Doctors Hospital on May 1, 1943. Thereafter, for almost 7 months she underwent surgery and treatment in that hospital, with some 19 operations being performed to treat her above-described injuries. She was readmitted to and treated at the same hospital from January 3 to January 19, 1944, and again in March 1945 and in July 1946.
The surgery and treatment during the years 1943 through 1946 did not result in union of the bone structure of the right leg. Osteomyelitis set in. Early in 1947, an orthopedic consultant at Coral Gables, Florida, advised amputation of the right leg. Her professional engagements were canceled, and she returned to New York City for examination by an orthopedic specialist. She was a patient at St. Luke’s Hospital, New York City, for 10 months in 1947, during which major operations were performed on the right leg for grafting of skin and bone.
Extensive and prolonged administration of narcotics in the 1943 hospitalization and again in 1947 resulted in moderate addiction to narcotics, despite the efforts of the patient and her various physicians and surgeons to avoid such condition. By the end of 1947, Miss Froman was in an extremely tense and depressed state of mind. Periodically throughout 1948 and until mid-1949, Miss Froman underwent treatments for emotional disturbance, was a patient for about 2 weeks at the Neurological Institute of the Presbyterian Hospital, New York City, in early June 1949, and finally was admitted to the Menninger Foundation on September 24,1949, and remained there for treatment of her mental condition until March 17,1950.
*684 22. The Menninger Foundation diagnosis and evaluation of Miss Froman’s condition as of the túne of her admission was as follows:
Psychiatric syndrome diagnosis: Hysterical character disorder with secondary obsessive defenses. Aggressive reaction manifested by emotional outbursts in response to minor frustrations with a pathological resentment. External precipitating stress: Air-plane accident. Predisposition: Childhood trauma. Degree of incapacity: Marked.
23. Upon her discharge from the Menninger Foundation, and upon the recommendation of that institution, plaintiff became and remained a patient of Dr. Lawrence S. Kubie, an eminent New York psychiatrist, who treated her regularly from May 1950 through 1957, and occasionally thereafter.
Dr. Kubie testified in this case that despite adversity in childhood and in her married life, plaintiff Froman had demonstrated unusual capacity to adjust to abnormal traumatic experiences, but that the cumulative effect of many painful operations, intermittent dependence on narcotics, repeated relapses of her injuries, unrelenting pain and suffering, the necessity to engage hi professional work to pay for surgical and medical treatments, being forced to present the illusion of health and well-being, only to experience cancellations and some collapses due to inability to perform, had reactivated all of Miss Froman’s emotional difficulties. It was Dr. Kubie’s further opinion that the seaplane crash was the cause of Miss Froman’s present mental disturbance, that she is now capable of performing only in a limited fashion for short engagements, and that extended or frequent schedules of performance are no longer physiologically or psychologically possible for her.
24. The shortening of Miss Froman’s right leg resulted in a substantial tilt of her pelvic bone structure, which physical disability ultimately caused a herniated spinal disc in the lower back, which in turn necessitated successive operations in 1957, 1958, and 1959 for removal of the herniated tissue, then for resection of the lateral femoral cutaneous nerve of the left thigh, and finally for fusion of vertebrae.
*685 25. Since February 28, 1943, plaintiff Froman has expended the total sum of $94,213.14 for medical, surgical, hospital and psychiatric treatment necessarily required for and resulting from the personal injuries sustained by her in the seaplane crash.
26. Plaintiff Froman has had Federal income tax savings since the seaplane crash in the amount of $11,370 on account of deductions in her tax returns of medical expenditures incurred for treatment and cure of her injuries sustained in the crash.
27. Prior to 1943, plaintiff Markoff was recognized in the professional entertainment industry as an outstanding solo accordionist. She had performed for a number of years at leading hotels, nightclubs, and theaters, some of such hotels being the Waldorf Astoria and Sherry Netherland in New York City, and some of the theaters being the Roxy, Paramount, and Capitol in New York City. She had fulfilled one engagement at the Waldorf Astoria at a rate of compensation of $500 per week, with room accommodations, for a 20-week period.
Due to lack of records, Miss Markoff was unable to establish in this case her average earnings per year prior to 1943, but she testified that she was regularly employed in the years prior thereto, for about 42 to 48 weeks per year, and that in her engagements at theaters like the Roxy and Paramount, she earned as high as $400 to $450 per week.
28. Plaintiff Markoff sustained severe personal injuries in the seaplane crash, consisting of contusions and lacerations of her head and scalp, knee and leg, tearing of one ear, a fracture of the ankle, severance of the flexor profundos tendons of the index and middle fingers of the left hand, and tearing of the tendon of the right shoulder. Following treatment at the Lisbon hospital for about 8 weeks, she returned to New York City and underwent operations for the injuries to her fingers, right shoulder and breast. She again had operations on her damaged fingers in 1943 and 1944 without success, tuberculosis infection having developed and caused loss of substance of the tendons. Further corrective surgery was not possible.
*686 Plaintiff Markoff, as a result of the seaplane crash, has a permanent loss of about 75 percent of the function of her left index finger and a total permanent loss of the function of her left middle finger, with obvious deformities of these fingers, and with the remaining two left fingers having become stiff in the terminal joints as a result of the infection. The chord and base buttons of the accordion are operated by the left fingers, and Miss Markoff’s ability to play the accordion has been substantially affected by these finger disabilities.
Miss Markoff also sustained as a result of the seaplane crash permanent injury to her back, with limitation of motion to about 50 percent of normal, and also permanent limitation of function of the right arm, being able to lift such arm only 45 degrees, contrasted to the normal range of 180 degrees.
As a consequence of the permanent injuries to her fingers and right shoulder, plaintiff Markoff has been unable adequately to perform as an accordionist, and her professional appearances have been practically limited to performance as a mistress of ceremonies. Her ability to obtain employment has been substantially diminished.
29. In 1944 plaintiff Markoff earned $350 on a U.S.O. tour, and her gross earnings from professional performances in the years 1945 through 1950 were as follows:
1945_$5,648.55
1946_ 6, 009.35
1947_ 7, 665.00
1948_ 4,102.50
1949_10,615.00
1950_ 9, 600. 00
The evidence does not establish what her earnings were from 1951 through 1958. She filed no Federal income tax returns and made no Federal income tax payments in the years 1951 through 1958, although she had gross earnings in excess of $600 per year, her explanation being that she was performing overseas for substantial periods of time, that she had less than $600 per year in earnings in the United States, and that she was advised she did not have to pay taxes on her overseas income.
*687 In 1959, plaintiff Markoff’s gross earnings were $2,261.
30. Since February 23, 1943, plaintiff Markoff has expended the total sum of $7,810 for medical, surgical, and hospital treatment necessarily required for and resulting from the personal injuries sustained by her in the seaplane crash.
31. Plaintiff Markoff has had no Federal income tax savings on account of any deductions in her tax returns of medical expenditures incurred for treatment and cure of her injuries sustained in the crash.
32. Prior to the seaplane crash, plaintiff Kosen and Koy Kognan were an outstanding comedy and acrobatic dance team, widely known as Lorraine and Kognan, and acclaimed by experts and critics in the entertainment industry as one of the best standard comedy acts in show business, and as on the threshhold of a brilliant career as top-ranking stars in the entertainment world. They had regularly appeared at leading theaters, such as the Paramount in New York City. They had performed under contract with Paramount Pictures, Inc., in the making of two motion pictures, and Paramount had exercised an option for their performance in two more. In addition, Paramount had the right to exercise three more options, each providing for the appearance of Lorraine and Kognan in two additional motion pictures.
33. The joint earnings of plaintiff Kosen and Koy Kognan in the 3 years immediately preceding the seaplane crash were as follows:
1940-$7,012.90
1941_ 18,824.97
1942_ 25,376.00
Of the total 1941 and 1942 earnings, $6,250.02 in 1941 was received from Paramount Pictures, Inc., for 6 weeks of work, and $7,500 from Paramount in 1942 for the same amount of work. Under its option exercised on February 2, 1943, less than a month before the seaplane crash, Paramount became obligated to pay Lorraine and Kognan $17,500 during the year commencing July 1,1943, for 5 weeks of work.
34.Plaintiff Kosen sustained severe personal injuries in the seaplane crash, consisting of bruises and lacerations of *688 her head, shoulder, face, hands and legs, a whiplash injury in the cervical region, loss of an upper right lateral incisor and right cuspid tooth, loss of a left upper bridge of her teeth, tearing of the lower lip from the mandible, a tom capsule of the proximal interphalangeal joint of her right index finger, tom ligaments of the left shoulder, fractured right tibia, torn capsule and ligaments of her right ankle joint, with partial foot drop, and crushed cortex of the lower portion of the shaft of her right tibia.
35. Following the seaplane crash, plaintiff Eosen was hospitalized in Lisbon for 3 to 4 weeks, and then returned to New York City where she received treatments from her physician. In May 1943 she went to Los Angeles, California, where she entered the William Branch Clinic and received treatments from Dr. Branch and a consulting orthopedic specialist.
As a consequence of her injuries sustained in the seaplane crash, plaintiff Eosen has had constantly recurring pain in her shoulder, leg, and neck, causing her to grind her teeth and thus damaging her bridge, necessitating frequent dental work. She has difficulty in sitting still for any period of time, difficulty in walking, limited motion of her neck, and limited motion of the proximal finger joints, all of which disabilities are due to permanent injuries received in the crash.
36. Plaintiff Eosen’s total earnings in 1944 were $8,657.15, comprised of $5,057.15 received for 6 months’ work as a mistress of ceremonies, but not as a dancer, on an overseas tour to entertain servicemen for Camp Shows, Inc., and $3,600 for a 4-week tour with the Overseas Caravan, a troupe of entertainers organized to show the American people at home the caliber of entertainment being presented to servicemen overseas.
In 1945, plaintiff Eosen, still not dancing, earned $1,250 per week for performing for 2 or 3 weeks at the Paramount Theater in New York City, and later that year earned $350 per week for 13 weeks on a tour to the Philippines for Camp Shows.
In late 1945 plaintiff Eosen commenced preparations to make a return to dancing, and in 1946 employed a male *689 dancing partner and bad a number of dancing engagements at various theaters, for which she received a total of $14-,-096.40 in that year. Out of this sum, she paid all expenses and a salary to her dancing partner.
In 1941 plaintiff Eosen had four theatrical engagements for which she received $9,428.60, from which she paid her partner’s salary.
In 1948, she received $150 for one theatrical engagement and $500 for a television appearance canceled after rehearsal.
In 1949, she received $650 for two theatrical performances and $500 for a television appearance.
In 1950, she earned $7,800 from theatrical and television appearances, and in 1951, $4,102.30 for four television appearances.
Plaintiff Eosen has not appeared anywhere as an entertainer since 1951. The decline and termination of her career as an entertainer were caused by the personal injuries sustained by her in the seaplane crash.
37. The extent of disability of the plaintiff Eosen (based on the 1957 Veterans Administration Schedule for Eating Disabilities) due to permanent injuries sustained in the seaplane crash, is 20 percent for injury to her shoulder girdle, 20 percent for her ankle injury, 10 percent for cervical spinal injury, 10 percent for lumbar spinal injury, and 5 percent for her right hand injury, or an overall 65 percent disability. These ratings are based on loss of function, not on loss of earning capacity, and make no allowance for disability resulting from pain.
38. Since February 23, 1943, plaintiff Eosen has expended the total sum of $8,625 for medical, surgical, dental, hospital, and chiropractic treatments necessarily required for and resulting from the injuries sustained by her in the seaplane crash.
39. Plaintiff Eosen has had Federal income tax savings since the seaplane crash in the amount of $252.24 on account of deductions in her tax returns of medical expenditures incurred for treatment and cure of her injuries sustained in the crash.
40. Plaintiff Froman was bom on November 10, 1907; plaintiff Markoff in the same year; and plaintiff Eosen on *690 January 18, 1912. Plaintiff Eosen married Eoy Eognan on November 4,1937, and after bis death on February 23,1943, remained a widow until April 13, 1946, when she married Matty Eosen who died in 1958.
41. By formal stipulation filed June 14, 1961, signed on behalf of each of the plaintiffs and the defendant by their respective attorneys of record, the parties agreed in part as follows:
A. The following computations represent the amounts the individual plaintiffs would be entitled to under the Federal Employees’ Compensation Act, assuming (1) that they had been Federal employees at the time of their injury on February 23,1943, and (2) that their resulting-disability resulted in the loss of income which would have entitled them to payments of the maximum amount of monthly compensation under the Act.
1.The total maximum amount of monthly disability payments from date of the accident, February 23, 1943 to October 31, 1949, inclusive:
J'ane Froman_$9, 368
Gypsy Markoff_ 9, 368
Jean Rosen_ 9, 368
2.The total maximum amount of monthly disability payments from November 1,1949 to December 31,1960, inclusive:
(a) Utilizing the amount of the maximum monthly payment under the Act prior to the October 1949 amendment:
Jane Froman-$15,633
Gypsy Markoff- 16,633
Jean Rosen_ 15,633
(b) Utilizing the amount of the maximum monthly payment under the Act as amended in October 1949:
Jane Froman-$70,350
Gypsy Markoff_ 70,350
Jean Rosen- 70, 350
3.The commuted value of future monthly payments under Section 14 of the Federal Employees’ Compensation Act as of January 1,1961:
(a) Utilizing the amount of the maximum monthly payment under the Act prior to the October 1949 amendment:
*691 Jane Froman_$17,367
Gypsy Markoff_ 17,357
Jean Rosen_ 19,047
(b) Utilizing the amount of the maximum monthly payment under the Act as amended in October 1949:
Jane Froman_$78,106
Gypsy Markoff_ 78,106
Jean Rosen_ 85,710